Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| PUEBLO DE PUERTO RICO<br><br>Parte Apelada<br><br>v.<br><br>CAROL D. SANTIAGO ARRIAGA<br><br>Parte Apelante | KLAN202200360 | Apelación procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Criminal núm.: D VI2019G0025 (704)<br><br>Sobre: APELACIÓN |
|---|---|---|

Panel integrado por su presidente, el Juez Rivera Colón, la Juez Lebrón Nieves y la Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de julio de 2025.

La apelante, la Sra. Carol D. Santiago Arraiga (Carol o Sra. Santiago) solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 13 de abril de 2022. Mediante dicho dictamen se declaró a la apelante culpable y convicta de infringir el Artículo 93(b) del Código Penal de Puerto Rico, *infra,* y no culpable de infringir el Artículo 5.05 de la Ley de Armas de Puerto Rico de 2000, *infra.* Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

**I.**

Surge del expediente que por hechos ocurridos el 26 de mayo de 2019, el Ministerio Público presentó dos (2) acusaciones en contra de la Sra. Santiago por violaciones al Artículo 93(b) del Código Penal de Puerto Rico de 2012, 33 LPRA sec. 5142 y al Artículo 5.05 de la Ley de Armas de Puerto Rico de 2000, 25 LPRA sec. 458d (derogada). En síntesis, se acusó a la apelante de asesinato en primer grado en la modalidad de asesinato estatuario al cometerse

el delito de agresión grave, que tuvo como consecuencia la muerte de Carlos Emil Ramos Díaz (Sr. Ramos o Merengue).

El juicio se celebró en varias fechas, comenzando desde el 20 al 23 de septiembre de 2021 y continuando desde el 5, 8 y 10 de noviembre de 2021, y luego el 13 de abril de 2022. Los testigos del Ministerio Público fueron: Agente Julio César Vázquez López, Agente Jesús Padilla Caballero, Omar Gadiel Rodríguez Ramos, Delis M Garay Benítez, Ángel Luis Silva Sánchez y el Dr. Carlos Fernando Chávez Arias. Mientras que los testigos de la defensa fueron: Adam Torres Bosque y la Dra. Yocasta Brugal Mena.

A continuación, resumiremos los aspectos relevantes de los testimonios de estos testigos.

### AGENTE JULIO CÉSAR VÁZQUEZ LÓPEZ

Declaró que está adscrito a la División de Servicios Técnicos del Centro de Investigaciones Criminales (CIC) de Vega Baja.[1] El 26 de mayo de 2019 atendió una escena de agresión grave ocurrido en horas de la noche.[2] Tomó fotos generales, incluyendo una camisa e identificó piezas de evidencia pertinentes al caso. A su vez, levantó sangre con un hisopo para ser analizada y comparada con una persona relacionada al caso.[3] A preguntas de la defensa, indicó que este caso se atendió como una agresión grave.[4] También, estableció que no hay fotos del botellón de vino *Capriccio* por el que se inició el altercado.[5]

### AGENTE JESÚS PADILLA CABALLERO

Declaró que reside en Estados Unidos desde julio de 2021, pero para la fecha de los hechos trabajaba como policía municipal en Cataño.[6] El 26 de mayo de 2019 se dirigió al Centro de Seguridad

---

[1] Transcripción de la Prueba Oral (TPO), pág. 6, líneas 1-2
[2] TPO, pág. 9, líneas 3-6.
[3] Véase, TPO, pág. 10.
[4] TPO, pág. 9, líneas 30-31.
[5] TPO, pág. 27, líneas 3-11.
[6] TPO, pág. 35, líneas 4-6.

Pública del municipio para llevarle un radio a un compañero. Al salir escuchó una persona gritar "¡policía, policía! mataron a una persona".[7] Ante ello, este fue a la escena en donde le mostraron la persona postrada en el piso. Allí, le dijeron que dos personas (varón y mujer) le cayeron encima al caballero y salieron corriendo.[8] Este activó el sistema de emergencia e informó que había una persona herida frente a la escuela José A Jiménez. La persona que se le acercó le indicó que podía identificar a los atacantes y lo montó en la patrulla. Cuando llegó al lugar, habló con el dueño de la vivienda y su esposa, los agresores no estaban en el lugar.[9] Este regresó a la residencia porque no había dejado a nadie custodiando el lugar y porque entendió que las personas podían regresar.[10] La descripción del agresor fue: varón trigueño, unos 5'9 de estatura, pantalón corto azul y sin camisa.[11] La dama con bastantes labios, volumen en cachete y pantalla en el rostro.[12]

A preguntas de la defensa indicó que cuando regresó a la escena le pasó por el lado a una fémina en bicicleta.[13] Posteriormente se percató que había visto la fémina identificada como agresora.[14] En el Informe de Incidente preparado el mismo día de los hechos se refirió únicamente a un varón y no incluyó la dama.[15] El testigo indicó que el informe de incidente lo preparó la misma noche de los hechos y plasmó que hubo un solo agresor. No obstante, a preguntas de la fiscal afirmó que fueron dos personas.[16]

---

[7] TPO, pág. 36, líneas 27-31.
[8] TPO, pág. 38, líneas 22-25.
[9] TPO, pág. 41, líneas 14-17.
[10] TPO, pág. 43, líneas 4-7.
[11] TPO, pág. 44, líneas 6-7.
[12] TPO, pág. 44, líneas 7-13.
[13] TPO, pág. 49, líneas 7-13.
[14] Íd.
[15] TPO, pág. 52, líneas 6-31.
[16] TPO, págs. 52-53, líneas 27-4.

## OMAR GADIEL RODRÍGUEZ RAMOS

El 26 de mayo de 2019, el testigo fue con unos amigos al *Truck Show* en Dorado donde estuvieron casi todo el día.[17] Luego, se fueron a su casa. Este estuvo en la piscina junto a su hija y los hijos de Adam, mientras que Merengue (la víctima) estaba sentado al lado de la piscina.[18] No obstante, Chino y Carol llegaron en bicicleta y se pararon frente a la residencia.[19] Chino cruzó la calle y se sentó encima de un carro, mientras que Carol se quedó en la acera al lado de la casa.[20] Ella iba con un padrino de sangría, se lo tomó y lo tiró al piso. Merengue le dijo que lo recogiera y lo tirara en el zafacón.[21] Ella le dijo que no recogería nada, que si quería lo recogiera él.[22] Ante ello, empezaron a discutir usando malas palabras.[23] Ella dijo que le daría una galleta a Merengue, quien le contestó que estuviese tranquila que no estaba en su casa.[24] Ella fue y le dio la galleta.[25]

Luego, llegó Chino donde estaban discutiendo Carol y Merengue.[26] El testigo salió de la piscina y le dijo a Chino que estaba en su casa y este le contestó que estaba en la carretera.[27] Ante ello, el testigo fue a darle cuatro puños a Chino.[28] Mientras eso ocurría, Carol seguía discutiendo con Merengue.[29] La esposa e hijos de este lo aguantaron.[30] Chino cruzó para la casa y comenzó a discutir con Merengue también.[31] Siguieron discutiendo y empezaron a darle golpes en distintas partes del cuerpo de Merengue[32]

---

[17] TPO, pág. 71, líneas 24-29.
[18] TPO, págs. 75-76, líneas 25-4.
[19] TPO, pág. 76, líneas 19-25.
[20] TPO, pág. 77, líneas 7-12.
[21] Íd, líneas 16-20.
[22] Íd, línea 22.
[23] Íd, línea 26.
[24] TPO, pág. 78, líneas 10-16.
[25] Íd.
[26] TPO, pág. 79, línea 11.
[27] Íd, líneas 25-26.
[28] Íd, línea 28.
[29] TPO, págs. 79-80, línea 31-1.
[30] TPO, pág. 80, líneas 19-20.
[31] TPO, pág. 81, líneas 1-8.
[32] Íd, línea 16.

Ante ello, Merengue se tropezó con el espejo de la guagua y se cayó.[33] Al caerse, Carol y Merengue siguieron dándole golpes en el piso.[34] Ella le daba puños en la cara, mientras que Chino le daba puños y patadas por el lado izquierdo.[35] Luego, Chino fue a la bicicleta y sacó un objeto punzante.[36] Después empezó a darle golpes a Merengue y estando en el piso le dio la puñalada en el lado izquierdo y en la sien izquierda.[37] En esos momentos Carol estaba al otro lado dándole golpes.[38] Chino se levantó porque la esposa del testigo dijo "ay lo mató".[39]

Luego, al lado de la residencia hay una escuela en el que iba saliendo un guardia, a quien detuvieron e informaron lo ocurrido.[40] El guardia se paró y cuando llegó la ambulancia salió con Adam a verificar si encontraban a Chino, pero no lo vieron.[41] Se llevaron a Merengue en ambulancia para Centro Médico donde murió.[42] El testigo le dijo que los atacantes fueron Chino y Carol.[43]

A preguntas de la defensa, el testigo indicó que estuvieron compartiendo el día entero en el *Truck Show* y, aparte de la comida, ingirieron bebidas alcohólicas.[44] Al llegar a la casa, tanto él como sus hijos, entraron a la piscina. Observó cuando Carol, desde la acera, lanzó un padrino de sangría al patio de la casa.[45] Merengue le cuestionó a Carol y no recuerda si Merengue le dijo que no fuera puerca y tirara eso en el zafacón.[46]

---

[33] Íd, líneas 24-26.
[34] Íd.
[35] TPO, págs. 82-83, líneas 14-9.
[36] Véase, TPO, pág. 84.
[37] Véase, TPO, pág. 85.
[38] Íd., líneas 21-24.
[39] Íd., líneas 26-27.
[40] TPO, pág. 89.
[41] Íd., líneas 23-25.
[42] Íd., líneas 28-31.
[43] Véase, TPO, pág. 91.
[44] TPO, págs. 93-94, líneas 31-9.
[45] Véase, TPO, pág. 95.
[46] Véase, TPO, pág. 97.

Durante la discusión de Carol y Merengue, Chino estaba al otro lado de la carretera.[47] Al ver la discusión, el testigo salió de la piscina, fue donde ambos y les dijo que dejaran la discusión porque estaban en su casa.[48] Al decirle eso, Carol se salió y se quedó en la acera donde continuaron la discusión. Merengue estaba en la silla, se paró y no se movió hacia la otra acera.[49] Cuando los vio peleando el testigo les dijo que dejaran la pelea.[50] Chino, quien estaba al otro lado de la carretera, empezó a discutir con Merengue junto a Carol.[51]

Mientras eso ocurría, no pudo observar lo que estaba pasando con Carol y Merengue porque ellos estaban detrás de él.[52] Su esposa e hijos intervinieron y lo llevaron hasta el lado de la piscina.[53] Este vio a Merengue discutir con Carol. Chino salió de donde estaba, fue a la bicicleta, que estaba al otro lado de la calle, y sacó un objeto punzante.[54] Luego, Chino junto con Carol empezaron a darle golpes a Merengue, quien tropezó y se dio con el retrovisor de la guagua.[55] Cuando Merengue cayó se dio en la parte de atrás de la cabeza.[56] Mientras este estaba en el piso, Chino le dio una puñalada en el lado izquierdo de la sien.[57]

### DELIS M GARAY BENITEZ

El 26 de mayo de 2019, fue junto a Adam y esposa, Omar y Merengue, a una actividad de camioneros en Dorado.[58] Ella regresó a su casa a mediados de las 6pm y el resto del grupo llegó una hora después.[59]

---

[47] Véase, TPO, pág. 99.
[48] TPO, pág. 99, líneas 5-10.
[49] TPO, pág. 100, líneas 27-31.
[50] TPO, pág. 102, línea 3.
[51] Íd, líneas 22-26.
[52] TPO, pág. 103, líneas 5-9.
[53] Íd, líneas 18-24.
[54] TPO, pág. 104, líneas 15-19.
[55] TPO, pág. 106, líneas 9-20; pág. 108, líneas 20-24.
[56] TPO, pág. 110, líneas 7-14.
[57] TPO, pág. 111, líneas 4-7.
[58] TPO, pág. 125, líneas 14-28.
[59] TPO, pág. 126, líneas 29-31.

Adam salió y ella se quedó en la piscina con los hijos de él, sus hijos y Merengue, quien se ubicó debajo de la carpa.[60] Llegó Chino junto a Carol en bicicleta.[61] Carol se estaba tomando un padrino de sangría y, al terminar, lo tiró para su patio.[62] Merengue le dijo que lo recogiera porque habían zafacones y ella dijo que no lo haría, que le daría una pescozá.[63] Merengue le hizo frente y le dijo que se la diera.[64] Ella le dio la pescozá y discutieron.[65]

Al Chino darse cuenta de la discusión fue a donde ellos.[66] Carol y Merengue se estaban diciendo palabras soeces.[67] Chino también discutió con Merengue.[68] Omar salió de la piscina y le dijo a Chino que se fuera de su casa y este le contestó que estaba en la calle.[69] Discutieron y ambos se fueron a los puños.[70]

En ese momento, agarraron a Omar y lo metieron al patio. Chino fue a la bicicleta, sacó algo (largo, plateado y de 4 pulgadas) del manubrio y lo tomó en su mano.[71] Regresó hacia Merengue y surgió otra discusión entre Chino y Merengue, y se fueron a las puños.[72] En ese momento Carol estaba parada.[73] Chino, quien estaba hacia la parte de adentro de la casa, le estaba dando a Merengue.[74] Cuando Chino le dio a Merengue, Carol también le dio con los puños cerrados en la espalda.[75] Merengue en ningún momento la tocó a ella.[76] Merengue tropezó con el espejo de la guagua, y cayó al piso.[77] Ahí Carol le dio en la cabeza a Merengue.[78]

---

[60] Véase, TPO, pág. 127.
[61] Véase, TPO, pág. 129.
[62] TPO, pág. 129, líneas 7-9.
[63] Íd., líneas 11-17.
[64] Íd.
[65] Íd., líneas 18-19.
[66] Íd.
[67] Íd., líneas 22-23.
[68] TPO, pág. 131, línea 27.
[69] TPO, págs. 131-132, líneas 29-2.
[70] TPO, pág. 132, línea 3.
[71] Véase, TPO, pág. 132.
[72] Íd., líneas 27-31.
[73] TPO, pág. 133, líneas 1-2.
[74] Íd., líneas 4-5.
[75] Íd., líneas 10-15.
[76] Íd., líneas 19.
[77] TPO, pág. 134, líneas 1-3.
[78] Íd., líneas 7-11.

Chino se paró sobre el cuerpo entre las piernas y le dio un punzón en el pecho, y que al verlo dijo "lo mató".[79] Después del punzón, Merengue dejó de reaccionar. La testigo dijo "lo mató" y Chino cruzó la calle, cogió la bicicleta y se fue.[80]

### ÁNGEL LUIS SILVA SÁNCHEZ

Adscrito a la División de Homicidios de Bayamón. El 26 de mayo de 2019 pasó por el lugar de los hechos.[81] El agente Padilla le dijo que atendía una querella de agresión.[82] Preguntó por el agredido y le informaron que había sido transportado a Centro Médico.[83] En la parte posterior de la casa había una piscina, una carpa, silla y una guagua.[84] También había una mancha de sangre y encontró una camisa que le informaron que pertenecía al atacante.[85] Según su investigación, la agresión se dio por un padrino que se lanzó contra los que estaban compartiendo en el lugar.[86] Carol tiró la botella, Merengue le llamó la atención y le dijo que lo recogiera porque habían zafacones.[87]

Carol se le acercó, le dio una bofetada y comenzó a agredirlo. Omar salió de la piscina y comenzó a pelear con Chino.[88] La esposa e hijos de Omar lo separaron mientras Carol seguía agrediendo a Merengue quien estaba en el piso.[89] Después de la bofetada, Merengue se tropezó con la guagua y se cayó. Carol agredió con sus puños el rostro de Merengue mientras estaba en el piso.[90] Chino fue a la bicicleta, sacó un objeto punzante y se dirigió donde estaba Carol y Merengue le clavó -en el área del pecho- un objeto punzante.

---

[79] Íd.
[80] TPO, pág. 136, líneas 16-17.
[81] Véase, TPO, pág. 153.
[82] Íd.
[83] TPO, pág. 155, líneas 8-12.
[84] Véase, TPO, págs. 156-157.
[85] Íd.
[86] Véase, TPO, pág. 160.
[87] Íd.
[88] Íd., líneas 16-24
[89] Íd.
[90] TPO, pág. 161, líneas 4-8.

La esposa de Omar gritó "lo mataste". Los agresores se levantaron y se marcharon del lugar.[91]

A preguntas de la defensa, el testigo indicó no recordar haber visto el botellón por el cual se inició la pelea.[92] No recordó que Adam le dijera que Merengue había cogido un tubo para defenderse de las agresiones.[93]

### DR. CARLOS FERNANDO CHÁVEZ ARIAS (DR. CHÁVEZ)

Es patólogo forense y practicó la autopsia de Carlos Emil Ramos Díaz (Merengue) cuya causa de muerte fue el severo trauma a la cabeza y en contribución las heridas de arma blanca.[94] Este alegó que el informe de la Dra. Brugal consistió mayormente en un resumen del récord médico y de un informe de autopsia.[95] Añadió, que no está de acuerdo con la conclusión de la Dra. Brugal.[96] También, expresó que hay mucha evidencia que nos dice que el trauma de la cabeza fue ocasionado por los golpes.[97]

Primeramente, el cuerpo llegó desde Centro Médico el 9 de junio de 2019.[98] Explicó que en sus hallazgos hay tres tipos de trauma: 1) heridas de arma blanca 2) trauma en la cabeza 3) otros traumas -herida de bala antigua en el hombro izquierdo, la cual no tiene relación con la muerte-.[99] Tuvo heridas de arma blanca que comprometen la cabeza.[100] Añadió, que llegó con contusiones del lóbulo temporal izquierdo del cerebro y que habían heridas de arma blanca en el lado izquierdo del tórax.[101] Además, dos heridas

---

[91] Íd.
[92] TPO, pág. 165, líneas 17-19.
[93] TPO, pág. 166, líneas 1-5.
[94] Véase, TPO, pág. 172.
[95] TPO, pág. 288, líneas 24-26.
[96] Íd., línea 29.
[97] TPO, pág. 289, líneas 3-9.
[98] Véase, TPO, pág. 173.
[99] TPO, pág. 174, líneas 4-7.
[100] Véase, TPO, pág. 176.
[101] Íd.

compatibles con heridas de arma blanca.[102] Así como una herida superficial en el brazo izquierdo.[103]

Hay una variedad de fotos que muestran la herida en proceso de cicatrización en la región temporal izquierda (sien) que penetra la cabeza hasta la duramadre, pero no punza el cerebro.[104] Es compatible con un objeto penetrante largo.[105] Sostuvo que pasó a la cavidad craniana e hizo el hueco hacia dentro de la cavidad craniana, que perforó la membrana.[106] Este produjo contusión localizada. El arma blanca no penetró el cerebro, sino los restos óseos que al perforar el hueso se van para adentro.[107] Las heridas de arma blanca, si son punzones no van a hacer efectos globales.[108]

Las heridas parecen que fueron hechas con el mismo objeto punzante.[109] Esta penetra la cavidad toráxica, perfora el pulmón izquierdo. De lo anterior, hubo sangrado en la cavidad toráxica y contusiones.[110] Había sangrado en la cavidad izquierda compatible con que hubo daño pulmonar.

Había otro tipo de trauma contundente-golpe localizada, en el mismo lado donde tenía la herida punzante del cuero cabelludo y que penetraba la cavidad craniana, pero no perforaba el cerebro.[111] Por ello, especificó que la herida punzante es local, no es tan global.[112] Más bien, la hemorragia ha sido causada por un objeto contundente que pudo ser un palo, la mano, cabeza, cualquier objeto que pueda causar daño como golpes o una superficie y puede ser compatibles con puños.[113]

---

[102] Íd., línea 22.
[103] Íd., líneas 26-27.
[104] TPO, pág. 177, líneas 24-25.
[105] TPO, pág. 179, líneas 4-8.
[106] Íd.
[107] Íd.
[108] Íd., líneas 25-30.
[109] TPO, pág. 181, líneas 1-5.
[110] Íd., líneas 22-26.
[111] Véase, TPO, pág. 185.
[112] Íd., líneas 14-19.
[113] Íd., líneas 29-30.

No obstante, 30 mililitros es una cantidad significativa en el sentido de que presionaba al lóbulo pronolariferio cerebral izquierdo.[114] La hemorragia estaba sobre el hemisferio cerebral izquierdo. La subaracnoidea y el cerebro tienen una curación que no es normal. Es de color oscuro que es producto de la baja oxigenación. Toda persona que ha estado en un respirador artificial llega a forenses, muchas veces, con muerte cerebral. Todos, prácticamente tienen esa coloración que significa que tiene cerebro hipóxico (baja oxigenación). El estar con baja oxigenación, mata el tejido y al final muere el cerebro y luego la persona.[115] Se ve un cerebro desvitalizado, que está con cambios hipóxicos.[116]

El occiso llegó al hospital el 26 de mayo de 2019 prácticamente en coma.[117] En la escala Glasglow de coma 15/15 quiere decir que la persona está despierta 5/15 prácticamente es severo.[118] Al día siguiente estaba en 3 que es lo más bajo de la escala Glasglow. Hubo sangrado por debajo del cuero cabelludo, el cual es más global.[119] El sangrado es compatible con puños en el área de la cabeza. Puede ser compatible con una persona que está tirada en el piso recibiendo puños en la cabeza.[120] Lo que sucede en el cerebro en este tipo de escenario es que el mismo se moviliza dentro de la cavidad craneal. Son huesos duros que el cerebro, cuando recibe un trauma, hace viajar al cerebro dentro de la cavidad craneana.[121] Cuando eso ocurre, sangran y ese es el producto del sangrado subdural. La aceleración del cerebro y la sumatoria de golpes bruscos hizo que se rompieran los vasos sanguíneos. Sangró por la cantidad de golpes que recibió.[122] Las contusiones corticales, ni en

---

[114] TPO, pág. 187, líneas 2-6.
[115] Íd.
[116] TPO, pág. 189, líneas 10-15.
[117] Íd., líneas 19-20.
[118] Íd., líneas 22-30.
[119] TPO, pág. 193, líneas 10-11.
[120] TPO, pág. 194, líneas 15-17.
[121] TPO, págs. 194-195, líneas 29-5.
[122] Véase, TPO, pág. 195.

el lóbulo frontal ni temporal pueden ser ocasionados por un objeto punzante, más bien fue ocasionado por múltiples golpes sobre la cabeza.

Con relación a la herida de arma blanca y el daño de trauma en la cabeza, a pesar de que están en el mismo sitio anatómico, la cantidad de sangrado que hubo no se puede explicar con la herida de arma blanca porque es más focal. No obstante, la herida de arma blanca contribuyó al daño porque el hueco tiene que haber hecho daño.[123] La causa de muerte que se hizo constar en el informe médico fue muerte por severo trauma a la cabeza y heridas de arma blanca.

A preguntas de la defensa, este explicó que el récord médico refleja las heridas de arma blanca del pecho y los golpes en la cabeza, pero no la herida de arma blanca.[124] Admitió que cuando un paciente tiene sangrado por dentro de la duramadre en el cerebro le baja un tipo de drenaje.[125] En este caso, no le hicieron drenaje al cuerpo porque no era candidato.[126] Con relación al cerebro lo encontró en estado desvitalizado y no hubo cicatrización.[127] No encontró ningún hueso con fractura.[128] No encontró otro tipo de sangrado de la cabeza compatible con otro golpe.[129]

A preguntas del Ministerio Público, este indicó que la herida de arma blanca es contundente y contribuyó a la causa de muerte.[130] Aun así, expresó que la causa de muerte fue un severo trauma en la cabeza, ya que la herida que identificó y la que dejó la contusión pudo haber sido un puño, un golpe contundente con

---

[123] TPO, págs. 196, líneas 25-29.
[124] TPO, pág. 204, líneas 1-14.
[125] Íd., líneas 15-21.
[126] Íd.
[127] Véase, TPO, pág. 206.
[128] Íd.
[129] Íd., pág. 207.
[130] TPO, pág. 211-212, líneas 29-2.

algún objeto o inclusive con la mano de la persona que clavó el objeto punzante.[131]

A preguntas de la defensa, el testigo explicó que, en un caso general, una persona que se cae y se da un golpe en la parte de atrás de la cabeza, pero aquí no hay fractura que demuestre que la caída ocasionó ese golpe.[132]

### ADAM TORRES BOSQUE

El 26 de mayo de 2019, este presenció la muerte de Merengue. Cuando regresó a la casa de Omar ya estaban peleando.[133] Este, indicó que le estaba gritando al muchacho y muchacha que se fueran. Añadió, que el trigueño fue a la bicicleta y sacó algo del cuadro, como un punzón de alambre.[134] Merengue cogió un tubo como para empujar a la muchacha flaca [Carol].[135] Lanzaba el tubo hacia adelante para que no se le pegaran.[136] Merengue se cayó y los dos empezaron a darle puños. Ella quedó como para la parte de la cabeza y él en las piernas de Merengue.[137] Él cogió el punzón y lo figó por el lado izquierdo debajo de la costilla y pulmones.[138] La muchacha de pelo riso empezó a gritar que "lo mató, lo mató".[139]

### DRA. YOCASTA BRUGAL MENA (DRA. BRUGAL)

Es patóloga forense y en la actualidad es Decana en la Escuela de Medicina San Juan Bautista en Caguas.[140] Evaluó la autopsia, el expediente médico, declaraciones juradas, análisis de toxicología, análisis de DNA y fotos. Luego de recibir y estudiar los documentos, determinó que la herida A está localizada en la cabeza, en la región temporal del lado izquierdo.[141] Es una herida punzante, penetrante,

---

[131] TPO, pág. 212, líneas 25-31.
[132] TPO, pág. 220, líneas 26-29.
[133] Véase, TPO, pág. 231.
[134] Véase, TPO, pág. 234.
[135] TPO, pág. 235, líneas 1-5.
[136] Íd., líneas 22-25.
[137] TPO, pág. 236, líneas 27-28.
[138] TPO, pág. 237, líneas 1-7.
[139] Íd., líneas 9-10.
[140] Véase, TPO, pág. 249.
[141] Véase, TPO, pág. 254.

o sea de un orificio pequeño, no más de ¼ de pulgada que penetra a través del hueso, los músculos y la duramadre. Había fractura del hueso temporal.[142]

Además, había traumas en la cabeza, una hemorragia bajo el cuero cabelludo, alrededor del cerebro, hematomas subdurales y una hemorragia subaracnoidea.[143] Pero cuando describe el cadáver, no se ve ningún trauma a la cabeza que no sea la herida punzante que produjo la fractura de hueso temporal y la penetración a la cavidad craneal.[144] En ese trauma es donde existe una hemorragia subdural y una subaracnoidea.

La doctora explicó que hay dos heridas que el occiso tenía en el tórax que penetraban las vértebras y el pulmón, y también produce daño de los músculos, contusión y perforación del pulmón. Encontró que esas heridas están cicatrizadas. El expediente médico expuso las heridas punzantes y penetrantes que tiene el cadáver, pero no habla de herida punzante en la cabeza.[145] Con relación al daño que provocó la herida de arma en la cabeza, entró y produjo unas contusiones alrededor de la herida. En la literatura médica, las heridas de arma blanca en la cabeza son sumamente crasas y generalmente penetran o por el hueso temporal.[146]

Indicó que es muy difícil ver una lesión en el cerebro porque es como esponjoso y cuando cesa la vida, ya no hay circulación. O sea, tampoco vamos a ver el cráneo sangrando porque ya no hay pulsaciones de sangre. Con relación al área de la herida de la cabeza, la doctora indicó que atravesó el cuero cabelludo, lóbulo frontal, el hueso temporal y la duramadre craneal.[147]

---

[142] Íd.
[143] Íd.
[144] TPO, pág. 254-255, líneas 29-2.
[145] TPO, pág. 255.
[146] TPO, pág. 256.
[147] TPO, pág. 257-258, líneas 22-2.

La herida le llamó la atención porque era como estilo taladro.[148] Las heridas de arma blanca a la cabeza son raras.[149] A veces son muy pequeñas, otras no hacen mucho daño, pero si por desgracia encuentran un vaso sanguíneo es un sangramiento subaracnoidea y arterial.[150] El hematoma subdural es un sangramiento venoso y ese es más difícil de parar.[151] En este caso ambos sangramientos ocurrieron.[152] La subaracnoidea siempre es traumática. Es la subaracnoidea de causas naturales casi siempre son en personas que tienen aneurisma congénito o tienen problemas de hipertensión maligna que tienen la presión bien alta.[153]

En su opinión lo que provocó la hemorragia fue el instrumento que penetró la cavidad craneal.[154] Su conclusión es que la persona muere por un severo trauma craneoencefálico.[155] Hubo sangramiento subaracnoideo que fue la causa de muerte.[156] Tampoco se puede olvidar que tenía un problema hepático que probablemente ayudó a que la persona sangrara más.[157] Esa conclusión se basa por la herida que se provocó y que en el protocolo de autopsia se identifica como A. Esa es la herida de temporal izquierda que es la que produce el daño severo en la cabeza.

Así las cosas, el último día del juicio, el Tribunal emitió un fallo de culpabilidad por asesinato en segundo grado del Artículo 93 del Código Penal, *supra*, y un fallo absolutorio por el Artículo 5.05 de la Ley de Armas, *supra*. Luego de denegar ambas mociones de reconsideración presentadas por ambas partes, señaló el acto de sentencia para el 20 de enero de 2022. No obstante, ese mismo día, el Tribunal le requirió a las partes regresar a sala, donde emitió un

---

[148] TPO, pág. 258, líneas 20-21
[149] Íd., líneas 21-23.
[150] Íd., líneas 23-27.
[151] Íd., líneas 17-29.
[152] TPO, pág. 259, línea 10.
[153] Íd., líneas 12-17.
[154] Íd., líneas 20-21.
[155] TPO, pág. 261, líneas 15-24.
[156] Íd.
[157] Íd., líneas 28-29.

nuevo fallo modificado por asesinato en primer grado, en su modalidad de asesinato estatutario. Finalmente, el 13 de abril de 2022, el Tribunal de Instancia impuso a la apelante una pena de 99 años de cárcel.

Inconforme con el proceder del Tribunal, la Sra. Santiago presentó este recurso y señaló la comisión de los siguientes errores:

**Primer error: Erró el Tribunal de Primera Instancia al declarar culpable a la Apelante cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable en violación al derecho a la presunción de inocencia y al debido proceso de ley.**

**Segundo error: Erró el Tribunal de Primera Instancia al declarar culpable por asesinato en primer grado a la Apelante por ser contrario al derecho constitucional contra la doble exposición, ya que emitió un fallo por asesinato en segundo grado, siendo este tracto contrario a la Constitución de Puerto Rico y a la de Estados Unidos.**

**Tercer error: Erró el Tribunal de Primera Instancia al no permitir a la defensa ser sugestiva al momento de interrogar a un testigo del ministerio público, el cual fue puesto a disposición de la defensa, ya que una vez comenzó el testimonio de éste, claramente surge una versión diferente al de los otros dos testigos oculares, lo cual limito el derecho de la Apelante al Derecho a contrainterrogar testigos de cargo.**

**Cuarto error: Erró el Tribunal de Primera Instancia, ya que del testimonio de un testigo renunciado surgió prueba con base suficiente para entender que el delito se cometió como consecuencia de una perturbación mental o emocional suficiente, o cuando menos bajo una súbita pendencia.**

**Quinto error: Erró el Tribunal de Primera Instancia, ya que al concluir que la muerte fue temeraria, debiera en cualquier caso ser reducido a asesinato atenuado, esto con base en que fue cometido como consecuencia (no de una razonable perturbación mental o emocional suficiente, sino) de una súbita pendencia.**

**Sexto error: Erró el Tribunal de Primera Instancia, ya que debe bajar a un delito de agresión simple, esto con base en que la prueba pericial de patología forense de la defensa estableció que los puños de la Apelante no fueron siquiera una causa suficiente, y que por el contrario las punzadas que le ocasionó al occiso otra persona, fueron la única causa de la muerte.**

**Séptimo error: Erró el Tribunal de Primera Instancia, ya que, incluso en el supuesto de que la conducta de la acusada hubiese llegado a ser la causa de hecho de la muerte, aun así tal relación causal no satisface el requisito de causa próxima. Esto debido a que no es normalmente previsible que un hombre adulto muera por causa de unos puños como los que la Apelante infligió en este caso.**

**Octavo error:** Erró el Tribunal de Primera Instancia, al concluir que había temeridad respecto a la muerte cuando solo se pudo probar más allá de duda razonable que la Apelante conocía que los factores de riesgo (puños en la cabeza) eran suficientes para crear un riesgo sustancial del resultado de la muerte.

**Noveno error:** Erró el Tribunal de Primera Instancia, al no tomar en cuenta en su determinación, nada de lo declarado por la perito de la defensa. Ello, a pesar de enfatizar y reconocer la capacidad y credenciales de dicha perita

**Decimo error:** Erró el Tribunal de Primera Instancia al no acoger el planteamiento de la defensa de que el Ministerio Público no proveyó prueba exculpatoria hasta la etapa del juicio en su fondo, a pesar de que tuvo conocimiento y control de la misma desde los inicios del proceso penal. Obviando de esta forma el Ministerio Fiscal su obligación de así hacerlo.

## II.

### A. Doctrina de la deferencia

En nuestro ordenamiento jurídico, es norma reiterada que, al enfrentarnos a la tarea de revisar la suficiencia de la prueba en convicciones criminales, nuestra función revisora está enmarcada dentro de unas consideraciones que nos limitan. Como sabemos, al momento de revisar las determinaciones que realizan los juzgadores de primera instancia, ya sea Juez o Jurado, debemos otorgarle una gran deferencia en cuanto a la prueba testifical presentada ante ellos. La regla general es que el tribunal revisor no debe intervenir con la adjudicación de credibilidad de los testigos ni sustituir las determinaciones de hechos basadas en las apreciaciones de esa prueba. *Pueblo v. Toro Martínez*, 200 DPR 834 (2018). Además, el veredicto del jurado, como la sentencia del juez, es un acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de las personas, y no es para echarse a un lado con liviandad e indiferencia. *Pueblo v. Figueroa Rosa*, 112 DPR 154 (1992). La norma expuesta, descansa en el hecho de que los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y

deferencia. *Pueblo v. Acevedo Estrada,* 150 DPR 84 (2000)*; Pueblo v. Rosario Reyes*, 138 DPR 591 (1995).

Claro está, a pesar de que la determinación de culpabilidad hecha por el juzgador de los hechos merece gran deferencia, ésta podrá ser revocada en apelación si se demuestra que hubo pasión, prejuicio o parcialidad y/o si se incurre en error manifiesto debido a que la prueba no concuerda con la realidad fáctica o es increíble o imposible. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49 (1991); *Pueblo v. Acevedo Estrada, supra*, pág. 99. Así, pues, a menos que existan los elementos mencionados o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo deberá abstenerse de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos. *Pueblo v. Maisonave Rodríguez, supra.*

En *Dávila Nieves v. Meléndez Marín*, 187 DPR 750 (2013), nuestro Tribunal Supremo tuvo la oportunidad de definir lo que es *pasión, prejuicio o parcialidad* y *error manifiesto*. A esos efectos, nuestro más alto Foro expresó que se incurre en *pasión, prejuicio o parcialidad* cuando se actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Por su parte, las determinaciones del foro revisado son un *error manifiesto* si de un análisis de la totalidad de la evidencia, el foro revisor queda convencido de que se cometió un error porque las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida debido a que se distancian de la realidad fáctica o es inherentemente imposible o increíble. Íd., pág. 772.

Finalmente, en cuanto a la cantidad de prueba requerida para sostener una convicción, es necesario acudir a la Regla 110 de Evidencia, 32 LPRA Ap. VI. Conforme al inciso (D) de dicho precepto reglamentario, "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley." Por ello, el testimonio de un sólo testigo - de ser creído por el juzgador de los hechos - es suficiente para sustentar una convicción; toda vez que no se trata de un análisis de cantidad.

## B. Presunción de Inocencia

El Art. II, Sec. 11 de la Constitución del Estado Libre Asociado de Puerto Rico, Art. II Const. ELA, LPRA, Tomo 1, garantiza a todo acusado de delito, el derecho fundamental a la presunción de inocencia durante todo el proceso criminal. Ese derecho, constituye uno de los imperativos del debido proceso de ley, según lo ha reconocido nuestro más alto foro local en múltiples ocasiones. *Pueblo v. Rodríguez Pagán*, 182 DPR 239 (2011). Además, y de manera más específica, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, dispone que, en los casos criminales, la culpabilidad de la persona debe ser establecida más allá de duda razonable. Es el Ministerio Público, quien tiene la obligación de presentar evidencia para cumplir con la carga probatoria de establecer la culpabilidad del acusado. Dicho de otra forma, el Ministerio Público tiene que probar - más allá de duda razonable - todos los elementos del delito, la intención o negligencia criminal en su comisión y la conexión de la persona acusada con los hechos. *Pueblo v. Acevedo Estrada, supra*, pág. 99.

No obstante, lo anterior, es necesario señalar que la *duda razonable* no es una duda especulativa ni se extiende a cualquier duda posible. El Tribunal Supremo de Puerto Rico ha definido como *duda razonable,* aquella duda fundada que surge como el

raciocinio de todos los elementos de juicio envueltos en un caso. Nuestro más alto foro local ha expresado además que, para poder rebatir la presunción de inocencia, el Ministerio Público deberá probar cada uno de los elementos del delito imputado y producir certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Irizarry*, 156 DPR 780 (2002); *Pueblo v. Bigio Pastrana*, 116 DPR 748 (1985); *Pueblo v. Cruz Granados*, 116 DPR 3 (1984).

### C. Doble Exposición

La Constitución de Puerto Rico dispone que "[n]adie será puesto en riesgo de ser castigado dos veces por el mismo delito". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Asimismo, la Quinta Enmienda de la Constitución de los Estados Unidos establece que nadie podrá ser sometido dos veces a un juicio por el mismo delito. Emda. V, Const. EE. UU., LPRA, Tomo 1. Esta protección constitucional tiene el propósito dual de impedir que un imputado sea expuesto a un proceso penal en más de una ocasión por la misma ofensa, y segundo, evitar que alguien sea castigado doblemente por el mismo delito. *Missouri v. Hunter*, 459 US 359, 365-366 (1983).

Lo que impide la protección contra ulterior exposición tras una condena por la misma ofensa es que una persona sea expuesta a un segundo proceso por "conducta que constituya una ofensa por la cual el acusado fue ya procesado". Ernesto L. Chiesa Aponte, *Procedimiento Criminal y la Constitución: Etapa Adjudicativa*, Ed. SITUM, 2018, pág. 607. Más no impide que un Tribunal reconsidere su fallo en un término razonablemente corto.

El Tribunal Supremo de Puerto Rico aclaró en *Pueblo v. Valdés Sánchez*, 140 DPR 490, 497 (1996), que un Juez de instancia tiene la "facultad para reconsiderar un fallo condenatorio si,

inmediatamente o en un término razonablemente corto después de hecho tal pronunciamiento, así se le solicita". Esto, "se extiende a la revisión de los méritos de la controversia y, por ende, a la determinación o fallo de culpabilidad, así como a la legalidad o severidad de la pena". *Pueblo v. Rivera Ortiz,* 209 DPR 402 (2022).

Nuestro Tribunal Supremo dispuso que antes de que la sentencia haya sido ejecutada, el foro de instancia tiene autoridad para reconsiderarla y modificarla, bien sea reduciendo o aumentando la pena impuesta. *Pueblo v. Silva Colón,* 184 DPR 759 (2012). Es sabido que los tribunales "pueden ejercer esta facultad a solicitud de parte interesada o *motu proprio* para ajustarlas a la ley, tanto para corregir un error en el que hayan incurrido al imponerlas, como para ajustarlas a cualquier situación de hechos que prueben una u otra parte". Íd., pág. 768–69. Así pues, el foro primario retiene jurisdicción para revaluar en todo o en parte corregir su fallo condenatorio. *Pueblo v. Rivera, supra,* pág. 426.

### D. Asesinato estatutario – *felony murder*

El Artículo 93 (b) del Código Penal, 33 LPRA sec. 5142, establece las distintas modalidades de lo que constituye el delito de asesinato en primer grado. Conforme al articulado, una de las modalidades de asesinato en primer grado es lo que se conoce el asesinato estatutario. En específico, el referido artículo dispone:

> Constituye asesinato en primer grado:
>
> (a)...
>
> (b) Todo asesinato causado al perpetrarse o intentarse algún delito de incendio agravado, agresión sexual, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago (excluyendo la modalidad negligente), envenenamiento de aguas de uso público (excluyendo la modalidad negligente), **agresión grave**, fuga, maltrato (excluyendo la modalidad negligente), abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal [...]. 33 LPRA sec. 5142. (Énfasis nuestro).

Para que se configure el asesinato estatutario se requiere que el asesinato se cometa a propósito, con conocimiento o temerariamente y como consecuencia natural de uno de los delitos

base antes expuestos. *Pueblo En Interés del Menor ESMR,* 189 DPR 787 (2013). Ahora bien, no es suficiente que el delito base sea la causa próxima de la muerte, "sino que es necesario que la comisión del delito base, o su tentativa constituya un riesgo considerable y típicamente relevante que se realice en el resultado". Íd.

En lo particular, se le responsabiliza al autor de delito con la pena de asesinato más alta en nuestro ordenamiento jurídico, ya que era previsto o este pudo prever que la consecuencia natural de su acción desembocaría la muerte de la persona. D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado*, 4ta ed. rev., San Juan, SITUM, 2019*,* pág. 158. De manera que, el asesinato aparece por la realización peligrosa de los delitos base antes mencionados y no como una consecuencia al azar. Íd. Así pues, el elemento mental de intención se da como consecuencia natural de los actos o cuando su actuación contenía un riesgo conocido sobre la peligrosidad de su conducta y aun así decidió actuar. *Pueblo v. García Cartagena,* 2024 TSPR 59, 214 DPR ___ (2024).

En *Pueblo v. García Cartagena,* nuestro más alto foro local explicó que "la incorporación del asesinato estatuario a nuestro ordenamiento penal lo que pretende es, precisamente, disuadir a los criminales de cometer delitos como este, los cuales conllevan un riesgo considerablemente elevado de que se suscite una muerte como consecuencia natural de sus actos violentos". Íd., pág. 9.

**E. Asesinato Atenuado**

El Artículo 95 del Código Penal define el asesinato atenuado como aquel que se comete cuando una persona da muerte a "propósito, con conocimiento o temerariamente, que se produce como consecuencia de una perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia [...]". 33 LPRA sec. 5144.

Este tipo de asesinato es uno intencional e ilegal, pero por existir circunstancias atenuantes la calificación y la pena varían en beneficio del acusado. D. Nevares–Muñiz, *op. cit,* pág. 160. "La circunstancia atenuante se da cuando el acto del acusado consiste de una reacción irreflexiva, pasional, súbita e inmediata, provocada por la víctima u otra persona actuando con ésta". *Pueblo v. Rosario, supra,* pág. 607. Según esta modalidad, la muerte de la víctima se produce sin que haya mediado premeditación y un plan previo para matar. *Pueblo v. Moreno Morales I,* 132 DPR 261 (1992).

Ahora bien, es importante para el juzgador de los hechos el determinar si hay una excusa razonable para la perturbación emocional o mental, y si hubo provocación adecuada de parte de la víctima. D. Nevares–Muñiz, *op. cit,* pág. 161. La provocación tiene que ser de tal naturaleza que lleve a una persona prudente y razonable perder su dominio capaz de lograr una reacción violenta, intencional, pero no calculada, ni preconcebida. *Pueblo v. Negrón Ayala, supra; Pueblo v. Rivera Alicea,* 125 DPR 37 (1989). No obstante, nuestro más alto foro local ha sostenido que si no existe esa provocación o si habiendo existido no es lo suficientemente grave, y la actuación del autor de delito está fuera de toda proporción con el grado de la provocación, el acto de dar muerte constituye asesinato aunque el acusado no lo hubiese preconcebido. *Pueblo v. Rodríguez Vicente,* 173 DPR 29 (2008); *Pueblo v. Lebrón,* 61 DPR 657 (1943)[158].

Por último, es menester aclarar que, a pesar de que la jurisprudencia citada corresponde al antiguo delito de "homicidio", nuestro Tribunal Supremo ha expresado que dado a que el delito de

---

[158] Es menester aclarar que, a pesar de que la jurisprudencia citada corresponde al derogado Código Penal bajo el anterior delito de "homicidio", nuestro Tribunal Supremo ha expresado que dado a que el delito de asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia" estos principios siguen vigentes. ELA v. Guadalupe, 206 DPR 616 (2021).

asesinato atenuado requiere una "perturbación mental o emocional suficiente para la cual hay una explicación o excusa razonable o súbita pendencia" estos principios siguen vigentes. *ELA v. Guadalupe*, 206 DPR 616 (2021).

### F. Prueba exculpatoria

El Ministerio Público está obligado a descubrir cualquier tipo de prueba que sea relevante a la inocencia o al castigo del acusado, independientemente de que la evidencia en cuestión cumpla o no con los criterios establecidos en las Reglas de Procedimiento Criminal. *Pueblo v. Vélez Bonilla*, 189 DPR 705 (2013). El Ministerio Público viene obligado a producir prueba exculpatoria, aunque el acusado no haya solicitado descubrimiento de prueba. *Brady v. Maryland*, 373 US 83 (1963); *Pueblo v. Hernández García*, 102 DPR 506 (1974). El incumplimiento con esta norma constituye una violación al debido proceso de ley constitucional, independientemente de la buena o mala fe que haya tenido el Ministerio Público al así actuar. *Pueblo v. Arzuaga*, 160 DPR 520 (2003). No obstante, no existe obligación del Ministerio Público de producir evidencia no exculpatoria, a menos que esta sea solicitada por el acusado.

Ahora bien, la prueba exculpatoria no es toda aquella "que por sí sola es capaz de producir la absolución del acusado, sino que es la que puede favorecerlo, sin considerar su materialidad o confiabilidad". *Pueblo v. Torres Feliciano,* 201 DPR 63 (2018); *Pueblo v. Vélez Bonilla, supra,* pág. 73 (citando a *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299 (1991)). No obstante, procede revocar una convicción y conceder un nuevo juicio ante la supresión de prueba favorable cuando es material. *Pueblo v. Torres Feliciano, supra,* pág. 77.

El juzgador concede un nuevo juicio cuando la supresión de prueba favorable es material a la culpabilidad o al castigo del

acusado. Íd. Es decir, procede cuando la prueba suprimida hubiera provocado un resultado distinto, ya que esta arroja una luz diferente en el caso, por lo que socava la confianza en el veredicto. Íd., pág. 93. Ahora bien, el análisis de la prueba suprimida "debe realizarse caso a caso, ya que depende de los hechos particulares del caso, de la prueba admitida en el juicio que dio lugar a la convicción y de la prueba en la que se funda la solicitud de nuevo juicio" Íd., pág. 77-78.

En *Pueblo v. Torres Feliciano, supra*, el Tribunal Supremo resolvió que, aunque el Ministerio Público no entregara prueba exculpatoria, no procede un nuevo juicio de forma automática. Esto, ya que no basta con que la prueba suprimida le sea favorable, sino que el acusado tiene "que demostrar que existía una probabilidad razonable de que el resultado del juicio criminal hubiera sido otro si los documentos no revelados se hubiesen revelado oportunamente a la defensa". Íd., pág. 97. Así pues, el acusado tiene que convencer al tribunal revisor de que la prueba favorable suprimida arrojaba una luz diferente en el juicio.

### G. Testigo Hostil

En nuestro ordenamiento jurídico, la Regla 607 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, dispone lo concerniente al orden y modo de interrogatorio y presentación de la prueba. Específicamente, el inciso (d) de la referida regla expone lo relativo a las preguntas sugestivas:

> (d) No se podrá hacer una pregunta sugestiva a una persona testigo durante el interrogatorio directo o el redirecto, excepto cuando sea una pregunta introductoria o una parte llame a una o a un **testigo hostil** [...]. (Énfasis nuestro).

Al respecto, la Regla 607(d) de Evidencia de Puerto Rico, *supra*, el profesor Ernesto L. Chiesa Aponte enumera las excepciones típicas a la norma general de no permitir preguntas sugestivas en el examen directo o redirecto de testigos. Éstas son las preguntas: (1) introductorias; (2) a un testigo hostil; (3) a la parte

adversa; (4) a un testigo identificado con la parte adversa; (5) a un testigo que, por razón de su edad, deficiencia mental, pobre expresión o por razón de pudor, no puede ser examinado eficazmente sin las preguntas sugestivas; (6) preguntas en contrainterrogatorio y re-contrainterrogatorio, (7) cuando los intereses de la justicia así lo requieran. E.L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, Ed. Situm, 2016, págs. 191–193; Véase, además, *Pueblo v. Vega Martínez*, 196 DPR 431 (2016).

**III.**

En el caso ante *nos*, la parte apelante indica en diez (10) errores que el Tribunal de Primera Instancia incidió en su dictamen. En específico, alega que:

> Primer error: Erró el Tribunal de Primera Instancia al declarar culpable a la Apelante cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable en violación al derecho a la presunción de inocencia y al debido proceso de ley.
>
> Segundo error: Erró el Tribunal de Primera Instancia al declarar culpable por asesinato en primer grado a la Apelante por ser contrario al derecho constitucional contra la doble exposición, ya que emitió un fallo por asesinato en segundo grado, siendo este tracto contrario a la Constitución de Puerto Rico y a la de Estados Unidos.
>
> Tercer error: Erró el Tribunal de Primera Instancia al no permitir a la defensa ser sugestiva al momento de interrogar a un testigo del ministerio público, el cual fue puesto a disposición de la defensa, ya que una vez comenzó el testimonio de éste, claramente surge una versión diferente al de los otros dos testigos oculares, lo cual limito el derecho de la Apelante al Derecho a contrainterrogar testigos de cargo.
>
> Cuarto error: Erró el Tribunal de Primera Instancia, ya que del testimonio de un testigo renunciado surgió prueba con base suficiente para entender que el delito se cometió como consecuencia de una perturbación mental o emocional suficiente, o cuando menos bajo una súbita pendencia.
>
> Quinto error: Erró el Tribunal de Primera Instancia, ya que al concluir que la muerte fue temeraria, debiera en cualquier caso ser reducido a asesinato atenuado, esto con base en que fue cometido como consecuencia (no de una razonable perturbación mental o emocional suficiente, sino) de una súbita pendencia.

Sexto error: Erró el Tribunal de Primera Instancia, ya que debe bajar a un delito de agresión simple, esto con base en que la prueba pericial de patología forense de la defensa estableció que los puños de la Apelante no fueron siquiera una causa suficiente, y que por el contrario las punzadas que le ocasionó al occiso otra persona, fueron la única causa de la muerte.

Séptimo error: Erró el Tribunal de Primera Instancia, ya que, incluso en el supuesto de que la conducta de la acusada hubiese llegado a ser la causa de hecho de la muerte, aun así tal relación causal no satisface el requisito de causa próxima. Esto debido a que no es normalmente previsible que un hombre adulto muera por causa de unos puños como los que la Apelante infligió en este caso.

Octavo error: Erró el Tribunal de Primera Instancia, al concluir que había temeridad respecto a la muerte cuando solo se pudo probar más allá de duda razonable que la Apelante conocía que los factores de riesgo (puños en la cabeza) eran suficientes para crear un riesgo sustancial del resultado de la muerte.

Noveno error: Erró el Tribunal de Primera Instancia, al no tomar en cuenta en su determinación, nada de lo declarado por la perito de la defensa. Ello, a pesar de enfatizar y reconocer la capacidad y credenciales de dicha perita

Decimo error: Erró el Tribunal de Primera Instancia al no acoger el planteamiento de la defensa de que el Ministerio Público no proveyó prueba exculpatoria hasta la etapa del juicio en su fondo, a pesar de que tuvo conocimiento y control de la misma desde los inicios del proceso penal. Obviando de esta forma el Ministerio Fiscal su obligación de así hacerlo.

Por estar intrínsicamente relacionados, discutiremos el primer, segundo, sexto y noveno error de forma conjunta. En primer lugar, la Sra. Santiago entiende que el foro de instancia incidió al declararla culpable por asesinato en primer grado, cuando la prueba de cargo no estableció su culpabilidad más allá de duda razonable. De lo anterior, resolvemos que la prueba de cargo estableció la culpabilidad de la apelante más allá de duda razonable. Según se expuso, la prueba consistió en seis (6) testigos y dos (2) peritos que testificaron en los juicios llevados a cabo el 20 al 23 de septiembre de 2021 y continuando desde el 5, 8 y 10 de noviembre de 2021, y luego el 13 de abril de 2022. Allí, todos los testigos que estuvieron presentes el día de los hechos indicaron que la apelante golpeó

bastante fuerte y con coraje a la víctima en la cabeza. Además, las descripciones que recibieron los agentes del altercado y de la persona agresora, coinciden con el perfil de la Sra. Santiago y lo testimonios de los testigos. Asimismo, el Dr. Chávez concluyó que la causa principal de la muerte de la víctima fueron los fuertes golpes en su cabeza.

Según se señaló, este Tribunal no debe intervenir con la adjudicación de credibilidad de los testigos, ya que es el foro primario quien está en mejor posición para evaluar la prueba desfilada, puesto a que es este quien tuvo la oportunidad de observarlos y escucharlos. Así pues, el Tribunal de Instancia brindó credibilidad más allá de duda razonable a los testigos presentados y su dictamen merece nuestra deferencia. Además, este Tribunal tuvo la oportunidad de analizar la Transcripción de la Prueba Oral de los testimonios y no encontramos que haya mediado error manifiesto, prejuicio o parcialidad alguna.

Por consiguiente, no le asiste la razón a la apelante en cuanto a que la prueba no demostró que los golpes producidos por esta provocaron la muerte del Sr. Ramos. Según vimos, en el juicio testificó la Dra. Brugal y el Dr. Chávez, ambos patólogos forenses. Allí, tuvieron la oportunidad de explicar sus hallazgos y resultados de la autopsia de la víctima. En específico, el Dr. Chávez concluyó que los golpes en la cabeza de la víctima provocaron su muerte. Al respecto, este explicó que no pudo haber sido el arma blanca quien mató al Sr. Ramos porque la autopsia reveló que el objeto punzante no entró en la duramadre cerebral. Sostuvo que, si hubiese entrado dicho objeto, este hubiera hecho un sangrado mucho más abundante y eso no se encontró en la autopsia.[159] Añadió, que, dado

---

[159] Véase, TPO, pág. 295.

que la víctima tenía 61 años, los golpes fueron aún más severos para este.

Por su parte, la Dra. Brugal concluyó que lo que ocasionó la muerte del Sr. Ramos fue el arma blanca utilizada por Chino, pareja de la apelante. La doctora explicó que fue el instrumento punzante el que penetró la cavidad craneal y provocó la hemorragia, que tuvo como consecuencia, el sangrado subaracnoideo que ocasionó la muerte de la víctima.[160]

Ciertamente, aunque ambos peritos contaban con vasta experiencia como patólogos forenses, el foro primario no tomó en consideración la opinión de la Dra. Brugal. Este Tribunal, como foro revisor examinó los testimonios de los peritos, y entendemos que no incidió el foro de instancia al otorgarle entera credibilidad y valor probatorio a la opinión médica del Dr. Chávez. Por tanto, reiteramos que es el foro de instancia quien tuvo la oportunidad de escuchar a los peritos y evaluar la prueba desfilada. Más aún, cuando del testimonio de los peritos en la Transcripción de la Prueba Oral se desprende que la opinión médica de ambos patólogos forenses incluyó explicaciones profundas que requería mostrar y señalar imágenes, que solo el foro primario pudo apreciar. Por ende, el foro de instancia estuvo en mejor posición para determinar el mejor peritaje de la autopsia del Sr. Ramos.

Por otra parte, la apelante alega que se cometió doble exposición al declararla culpable bajo asesinato en primer grado cuando ya se había emitido un primer fallo por asesinato en segundo grado. No le asiste la razón. Nuestro ordenamiento establece que el juez tiene la facultad inherente para reconsiderar un fallo de culpabilidad si, inmediatamente o en un término razonablemente corto después, así se le solicita o a *motu proprio. Pueblo v. Valdés*

---

[160] Íd.

*Sánchez, supra,* pág. 497. En este caso, el foro de instancia emitió un fallo de culpabilidad por asesinato en segundo grado, pero ese mismo día el Ministerio Publico solicitó reconsideración en sala, a lo que el referido foro le concedió y cambió el fallo a asesinato estatutario. Por ello, no se cometió la alegada doble exposición, ya que el foro sentenciador tenía la facultad de considerar su fallo de ese mismo día.

Ahora bien, en cuanto al tercer error, la apelante alega que no se le permitió a su defensa ser sugestivo al momento de interrogar el testigo del Ministerio Público. Según la Transcripción de la Prueba Oral, encontramos que no se cometió dicha alegación. Ciertamente, la defensa de la Sra. Santiago solicitó al foro primario que se declarara uno de los testigos como hostil. No obstante, la referida solicitud se hizo antes de que el alegado testigo hostil se sentara a declarar, lo que ocasionó que dicho foro la declara sin lugar por ser prematura.[161] Por consiguiente, el alegado testigo hostil se sentó a declarar y en una sola ocasión el fiscal objetó que la defensa estaba siendo sugestiva. Ante ello, el juez la declaró con lugar. Ahora bien, en ese momento la defensa no objetó que el testigo era hostil, como se lo había indicado el juez de instancia. Nótese que, el foro primario no le negó a la defensa la solicitud de establecer que un testigo es hostil, más bien, este le indicó que en el momento en que lo solicitó era prematuro. Así pues, cuando la defensa tuvo la oportunidad de levantar que el testigo era hostil no lo hizo, por lo que perdió su oportunidad en el juicio.

En torno al cuarto y quinto error, la apelante alega que, a lo sumo, debió imputársele el asesinato atenuado del Artículo 95 del Código Penal, *supra.* Según vimos, los testimonios establecieron que el comienzo de la discusión que tuvo como consecuencia la muerte

---

[161] TPO, pág. 225, líneas 1-31.

de la víctima se dio por este decirle a la apelante que recogiera un botellón de sangría. Ante dicho altercado, y luego de un intercambio de malas palabras, la Sra. Santiago fue a donde se encontraba el Sr. Ramos y le dio una bofetada. Inmediatamente después se une a la discusión la pareja de la Sra. Santiago y entre ambos golpearon a la víctima hasta este caer al suelo, que continuó con más golpes que lo dejaron inconsciente y, botando sangre por nariz y boca.

En vista de esto, el que el Sr. Ramos le dijera a la apelante que recogiera el botellón de sangría no es razón o excusa para ocasionar una reacción violenta por una persona prudente y razonable, en cambio está fuera de toda proporción al acto de dar muerte. Más aún, cuando en el altercado la víctima nunca se presentó con violencia ante sus agresores y estos lo tomaron como ventaja para golpearlo de forma desmedida. Por tanto, no encontramos excusa razonable a la reacción violenta de la apelante, así como tampoco una provocación adecuada y suficiente de la víctima que nos permitiera concluir que se cometió asesinato atenuado.

Así pues, en el séptimo y octavo error, la apelante alega que no se cometió el asesinato estatutario, ya que no se estableció el requisito de causa próxima. Además, sostuvo que su conducta (los puños en la cabeza) no era un riesgo sustancial para ocasionar la muerte del Sr. Ramos. Razonamos que, no estamos de acuerdo con la apelante, y, en consecuencia, resolvemos que se configuró el asesinato estatutario del Artículo 93(b) del Código Penal, *supra*.

Como señalamos, en nuestro ordenamiento jurídico el delito de asesinato estatutario se configura, siempre que el acusado haya puesto en marcha una sucesión de eventos que hacían previsible la muerte de un ser humano. *Pueblo v. Interés del Menor, supra; Pueblo v. Calderón Laureado, supra.* Asimismo, se debe examinar si se cumplieron con los elementos del delito, la

intención y la conexión de la apelante con los hechos. En lo particular, la muerte del Sr. Ramos ocurrió al la apelante cometer el delito base de agresión grave. La prueba demostró que la Sra. Santiago fue la que con sus puños agredió la cara y cabeza de la víctima hasta dejarlo inconsciente. Los testimonios aseguraron que una vez la víctima se encontraba en el suelo, la apelante golpeó con fuerza y en repetidas ocasiones, la cabeza de este. Así pues, reiteramos que la autopsia del Dr. Chávez demostró que la muerte se debió a los fuertes golpes en la cabeza de la víctima.

De lo anterior, no hay duda de que la Sra. Santiago puso en marcha una cadena de eventos de los cuales era claramente previsible y razonable que ocurriera la muerte del Sr. Ramos. El golpear a una persona de 61 años con fuerza y repetidamente en la cabeza era un riesgo previsible de que podía ocasionarle su muerte. Ciertamente, el elemento de intención está presente porque fue una consecuencia natural de la acción de agresión grave, que, como delito base, produjo la muerte de la víctima. Por ello, es claro que la prueba presentada demostró que se configuró el asesinato estatutario del Artículo 93(b) del Código Penal, *supra.*

Por último, en el décimo error, la apelante alega que el Ministerio Público no proveyó prueba exculpatoria hasta la etapa del juicio. Según vimos, el Ministerio Público está obligado a descubrir cualquier tipo de prueba que sea relevante a la inocencia o al castigo del acusado. No obstante, para que proceda la revocación de una convicción y conceder un nuevo juicio ante la supresión de prueba exculpatoria debe provocar un resultado distinto, ya que arrojaría una luz diferente en el caso. En cuanto a la prueba, la apelante alega que es exculpatoria, ya que: (1) el testimonio de uno de los testigos que explicó que la víctima agarró un tubo para que no se le acercaran los agresores y, (2) que este mismo testigo escuchó a la apelante decirle a Chino "lo mataste".

Según discutido, no basta con alegar que la prueba suprimida es favorable a la persona acusada. La aquí apelante tenía que demostrar que existía una probabilidad razonable de que el resultado del juicio hubiese sido distinto si dicha información se hubiera revelado oportunamente a la defensa. Por su parte, la apelante entiende que procede el nuevo juicio porque se le privó de hacer una investigación relacionada al tubo de la víctima. Asimismo, sostiene que el resultado hubiese sido distinto por la apelante haber manifestado "lo mataste", ya que demostraría que no hubo el estado mental requerido en el delito de asesinato estatuario.[162] No le asiste la razón.

No podemos otorgarle a la prueba en cuestión el significado que la apelante pretende, ya que no nos convence que esta hubiese arrojado un resultado diferente en el juicio. Según vimos en la Transcripción de la Prueba Oral, el testimonio de los testigos indicó que el Sr. Ramos fue agredido brutalmente por la apelante, pese a que este se encontraba indefenso en el suelo. Por ello, no consideramos que la prueba del tubo o que la apelante haya dicho "lo mataste", cambie que esta fue la que con sus puños dio muerte al Sr. Ramos. Esto, ya que según reseñamos, la intención en el asesinato estatuario se da como consecuencia natural de los actos o cuando su actuación contenía un riesgo sobre la peligrosidad de su conducta y aun así decidió actuar.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte del presente dictamen, *confirmamos* la *Sentencia* apelada.

---

[162] Véase, Alegato de la Apelante, pág. 37.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones